IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DR. KARA BUCCI<br>*Plaintiff,*<br><br>VS.<br><br>M.D. ANDERSON PHYSICIANS NETWORK<br><br>*Defendants.* | § § § § § § § § § § § § | <br><br><br>CIVIL ACTION NO. 19-1651__<br><br><br>JURY DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COMES**, KARA BUCCI, hereinafter referred to as Plaintiff, complaining of and about M.D. ANDERSONS PHYSICIANS NETWORK, hereinafter referred to as Defendant, and for cause of action will show unto the Court as follows:

## I.
## NATURE OF ACTION

1. This is an action brought pursuant to Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963 to correct and recover for Defendant's unlawful employment practices on the basis of Plaintiff's sex (gender) as well as Defendant's retaliation against Plaintiff's for her opposition to such discrimination.

1

## II.
## JURISDICTION AND VENUE

2. This Court has subject-matter jurisdiction pursuant to 28 U.S.C § 1331, Title VII of the Civil Rights Act of 1964 and Equal Pay Act of 1963, 29 U.S.C. §§ 206(d), 216(b), and damages are within the jurisdiction of this court and will continue to increase as this case proceeds to trial.

3. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b) because the Defendant maintains its principal office within this judicial district.

## III.
## PARTIES AND SERVICE

4. Plaintiff, KARA BUCCI, is a citizen of the United States and the State of New Mexico and resides in Albuquerque, New Mexico.

5. Defendant, M.D. ANDERSONS PHYSICIANS NETWORK ("MDA" or "MDAPN"), with its principal office in the State of Texas and operating business in Houston, Harris County, Texas.

6. Defendant, M.D. ANDERSONS PHYSICIANS NETWORK., may be served with process via certified mail return receipt requested by serving its Registered Agent of Service: C T Corporation System, Inc., at 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136 USA.

## IV.
## CONDITIONS PRECEDENT

7. All conditions precedent to jurisdiction have occurred with regard to exhaustion of administrative remedies.

## V.
## FACTS

8. Dr. Bucci served as Associate Professor of Radiation Oncology at the University of Texas M.D. Anderson Cancer Center. She received her medical degree at the University of Michigan Medical School and completed Radiation Oncology Residency training at the University of Pennsylvania Health Systems. Dr. Bucci is board certified in Radiation Oncology. She is undoubtedly highly qualified for the position she held at MDA.

9. Despite her qualifications and skills Dr. Bucci suffered from a hostile work environment, discrimination based on her sex, as well as retaliation following complaints she made about disparate treatment, quality of care and patient safety. As a result of these complaints Dr. Bucci's contract with MDA was not renewed based on the unlawful treatment by the facility.

10. Dr. Bucci was treated differently from the very beginning of her tenure with MDA. Not only was she treated terribly by her supervisors but the staff was encouraged to disrespect her as well. The appointments of Dr. Ramesh Gopal as Site Lead and Dr. Gregory Chronowski as Deputy Section Chief resulted in an unprofessional and abusive work culture that condoned bullying and harassment and led to a hostile work environment for Dr. Bucci. The general department culture suffered upon their appointment, gender bias among staff was condoned and in fact encouraged rather than dispelled, and the interpretation of "quality and safety" became distorted.

11. Dr. Gopal's behavior toward Dr. Bucci was frequently inappropriate. He would often scream at her and point his finger at her while yelling at her. He berated Dr. Bucci in front of staff; humiliating her and generally disrespected her on a daily basis. These instances

worsened after Dr. Bucci complained to Dr. Elizabeth Bloom, Deputy Executive Medical Director, and Dr. Deborah Kuban, Deputy Division Head, Division of Radiation Oncology, in March, 2018. Despite the seriousness of her complaints, which included Dr. Gopal's and Dr. Chronowski's abuse of power based on gender bias and a hostile and unprofessional work environment, her concerns were poorly handled and/or ignored by Dr. Chronowski.

12. When Dr. Chronowski took the position of Deputy Section Chief he purportedly told other staff members that he was "not a fan" of Dr. Bucci. Not only was this a personal affront, but because he was also her official mentor, this led to very little professional guidance or help. Directly due to this lack of supervision by Dr. Chronowski, Dr. Bucci believes that Dr. Gopal's own belligerent behaviors were sanctioned and reinforced by Dr. Chronowski. For instance, when Dr. Bucci started work in July, 2016, Dr. Gopal told the staff that her position was "temporary," and "at his discretion," (neither of which was true). He also made it clear that he sought staff feedback on her performance. This put the staff in a position of evaluating a physician. Not only did this undermine her position as a physician but it also severely decreased the confidence of the staff. To her knowledge, Dr. Bucci was the only physician member of the team who was placed in a position of being evaluated by the staff. This also set a tone for the staff to view Dr. Bucci in a subordinate position and severely undermined her authority. Instead, the staff was empowered to direct Dr. Bucci and to evaluate her under the direction of Dr. Gopal. Dr. Gopal did not treat other male physicians similarly.

13. Additionally, Dr. Bucci was constantly introduced as a "junior physician," even though she has more clinical and academic experience than either Dr. Garg or Dr. Gopal, and was the

only one of the three who had worked as a faculty member in Houston. This type of demeaning behavior was clearly indicative of gender bias.

14. Not only was she constantly demeaned and belittled by Dr. Gopal and Dr. Chronowski, but her professional opinions were ignored as well and to the detriment of patients. For instance, Dr. Bucci once had a breast brachytherapy patient at Kaseman Hospital. She performed the first fraction at 10:00 a.m. The second fraction was scheduled at 4:00 p.m. to allow for six hours in between fractions as per protocol. However, Dr. Bucci had to go back to Rust Hospital for a meeting prior to the second fraction and was not scheduled to return to Kaseman that day. Dr. Gopal informed Dr. Bucci that he was leaving at 2:00 pm, so would do the second fraction at 2:00 p.m.; however this would mean there would only be a four hour window between treatments – a clear breach of protocol. Dr. Bucci offered to return to Kaseman for the second fraction at 4:00 p.m., rather than advance the timing of the second fraction. Dr. Gopal became very angry at her suggestion, which he clearly perceived as a challenge to his authority. At that point he made a "V" with the fingers, pointed to his eyes and her, and said with in a very intimidating manner, "I am telling you, do not rock this boat!" Dr. Gopal then insisted on doing the second fraction at 2:00 p.m. which resulted in a breach of protocol.

15. This issue of twice daily fractions is quite important and in fact, came up recently at MDA's ACR site accreditation visit. Dr. Gopal <u>specifically</u> told the ACR official that the facility always uses a 6-hour window, which in fact is <u>not</u> true.

16. In addition to these types of breaches in protocol, Dr. Gopal refused to accept Dr. Bucci's treatment plans or recommendations. He did not do this with male physicians. For example,

5

when Dr. Bucci started her job her site was not routinely doing cone beam CTs (CBCTs). Her attempts to use CBCTs more often than her colleagues caused a surprising amount of conflict. Despite multiple attempts to discern where the reluctance was coming from and to explain to all levels of staff the utility of CBCTs, the resistance did not abate. The staff was suspicious of anything Dr. Bucci did that Dr. Gopal did not do and Dr. Gopal did nothing to support Dr. Bucci. Dr. Gopal himself resisted doing CBCTs because he believed that they took too long to review and were inherently worthy of suspicion because they are new and different. When Dr. Bucci asked him about a hypothetical patient improvement with a known gain, his answer was, "Nothing new is ever better. These things are always a waste of time!" However, lifelong learning is <u>critical</u> to every field of medicine, but especially radiation oncology, especially given the massive changes that the field has undergone in the last fifteen years. Dr. Bucci found Dr. Gopal's attitude surprising and disappointing in radiation oncology and counterproductive to the dissemination and adoption of new innovation. She has a strong belief that had she been male Dr. Gopal would have been much more receptive to her suggestions.

17. Not taking Dr. Bucci's recommendations under consideration was nothing new for Dr. Gopal though. He routinely dismissed her suggestions and observations. For instance, at one point Lauren Cates, Director of Consumer Convenience & Market Development at Presbyterian Healthcare Services, Inc. met with Dr. Bucci, Dr. Gopal and Dr. Gopr to discuss the capital budget. Dr. Bucci offered several suggestions during the meeting. After the meeting was over, Dr. Gopal came into Dr. Bucci's office and told her that he was "horrified!" that she had "dared to speak!" during the meeting." He told Dr. Bucci that

"only the leader should speak. It is not your place to speak!" He actually stood over Dr. Bucci during this reprimand while **pointing his finger in her face and yelled at her**. His words were not only demeaning, and his shouting unprofessional, but his body language was also quite threatening and intimidating for Dr. Bucci.

18. Dr. Bucci hostile treatment extended to the staff as well. For example, at one time a nurse complained that Dr. Bucci kept patients waiting too long in rooms.  In an effort to resolve this issue Dr. Bucci discovered that the nurse was not notifying her when patients were in rooms or ready to see her. The nurse claimed that she was unable to find Dr. Bucci; however, this was truly impossible in the very small shared office. Additionally, in the HALs, cell phones function as pagers so there was no reason whatsoever for this nurse to have any difficulty finding Dr. Bucci.  Despite the spuriousness of her claims, Dr. Gopal supported the nurse and not Dr. Bucci even when Dr. Bucci explained that this nurse never tried to call, page, or text her. Dr. Gopal instead told Dr. Bucci to keep a close eye on EPIC to see when patients check in, rather than have the nurses inform Dr. Bucci when a patient was ready - as is customary. Dr. Gopal did not require this of Dr. Garg.

19. Dr. Gopal also told Dr. Bucci that safety links had been filed on her for walking into patient rooms too soon, before the nurse has finished her assessment.  He said her early arrivals indicated that she did not respect the nurses and he warned Dr. Bucci not to interrupt the nurse. Dr. Bucci was thus "damned if you do, damned if you don't." If the patient waited had to wait, she was reprimanded. If she arrived early, she was reprimanded.  However, the nurse would not tell Dr. Bucci when her patients were ready. So, per Dr. Gopal, it was her job to watch EPIC for patient check in times and to keep an eye on the patient rooms

to see when the nurse came out. And if Dr. Bucci missed the nurse exiting and thereby kept the patient waiting, this would be deemed an appropriate safety link, worthy of reprimand. This was clearly nothing more than harassment and an effort by Dr. Gopal to find fault in everything that Dr. Bucci did.

20. Additional repeat safety links on Dr. Bucci included a delay of any length, even minutes, between signing a plan in Mosaiq and signing a prescription, regardless of patient start time (e.g. patients who stared one week later). In fact, when Dr. Bucci covered for these two male doctors she was asked to sign plans and prescriptions for patients preparing to get on the table. This represented a significant delay on their part in signing plans and prescriptions. However, safety links were _not_ filed for Drs. Garg and Gopal in these instances. When Dr. Bucci asked Dr. Gopal what he thought the reason might be for the disparity of reporting between her and the male physicians, his answer was, "the staff all hates you!"

21. Safety links were also used punitively although they were never supposed to be used in that manner. Approximately half of her salary was from work RVUs; so Dr. Bucci suffered a financial penalty for safety links filed during her week off.

22. In yet another example of staff disrespect, Mark Garcia, Radiation Technologist, refused to change a brachytherapy plan when Dr. Bucci told him to. Instead he told Dr. Bucci that he needed approval from Steve Kirschener or the main center. Once he had gotten that approval he did not show Dr. Bucci the plan. This is a direct example of how Dr. Bucci was treated by staff on a daily basis. This behavior was condoned and encouraged by Dr. Gopal, Dr. Chonowski and Dr. Garg.

23. Another time, after Dr. Chronowski's last visit, Dr. Gopal very publicly called Dr. Bucci into his office and reprimanded her in front of the staff. He told Dr. Bucci that she would be spending four days a week at Kaseman instead of three and seeing fewer patients. He determined that the increase in safety links required him to "keep an eye on [her]," and reduce her patient load. Additionally, Dr. Gopal said he was joking with the staff about how he should be paid extra for all the work he was doing to "keep an eye on [her]." The implication that he was joking with the staff about Dr. Bucci is very disturbing. Dr. Bucci was publicly humiliated by Dr. Gopal and suffered a financial set back because of safety links which had been triggered by Drs. Gopal and Garg. This behavior was not only harassment and unprofessional but it was also quite unbecoming of the medical standard set by MD Anderson.

24. Another example of harassment involved simulation orders. Dr. Gopal asked Dr. Bucci not to attend simulations. Dr. Bucci was then told by Drs. Gopal and Chronowski that Dr. Bucci was not communicating well enough with the therapists about what Dr. Bucci wanted for simulations, despite being told not to attend. Again, she was damned if she did and damned if she didn't. In an effort to be clearer with simulation instructions and requirements, Dr. Bucci raised this issue during her last quarterly phone call. During the discussion, Dr. Chronowski continually interrupted and spoke over her, invalidating what Dr. Bucci said, and showed a complete unwillingness to work with Dr. Bucci on the issue. Dr. Chronowski never showed Dr. Garg or Dr. Gopal the same hostility or disrespect.

25. Another time, while on a call with several people including Drs. Chronowski and Dr. Gopal, Dr. Bucci pointed out a key problem with regard to the fact that selection options

9

for written simulation orders were limited, and the free text option was difficult for the therapists to read during simulation. Instead of asking her about the issue, Dr. Chronowski turned to Dr. Gopal (completely dismissing Dr. Bucci), and asked, "Is that true, Ramesh?" This completely invalidated Dr. Bucci's observations and comments and undermined her authority. Dr. Bucci offered to review the orders with Dr. Chronowski but he replied that he would review them with Dr. Gopal. Several other people on the phone call were witnesses to this exchange.

26. During the last site visit to Albuquerque, Dr. Chronowski and Robert Ghafar, MDA Division Administrator, met with Dr. Bucci with an agenda that she had no advance knowledge of and blindsided her with false accusations. Dr. Bucci was told that she was an "outlier" and they complained about her changing too many plans; having too many safety links; having too many patients fall into the safety pool; and making too many changes on daily films. She was told that there was data supporting these claims, however, Dr. Bucci asked for and never received any of that supporting information. Nevertheless, on the quarterly phone call, the data presented appeared to show that Dr. Bucci actually had <u>fewer</u> changed plans than other doctors.

27. Dr. Bucci provided data to Dr. Chronowski and Robert Ghafar on all of her patients who fell into the safety pool; most of which were either gynecology patients waiting on main center approval or patients Dr. Bucci was unable to sign during her week off. These facts had no impact whatsoever on their assessment of her performance.

28. Despite her ability to rebut all of Dr. Chronowski's and Mr. Ghafar's claims, she was told in strong language that she was not to change dosimetry's plans and that she was not to

make adjustments on daily films. Dr. Bucci felt very certain at that point that her employment would be jeopardized should she refuse to follow their instructions. This required her to violate her duties and responsibilities to patient care as the attending physician. Not only was this unethical, but Dr. Bucci strongly believes that this was also gender bias.

29. Not allowing Dr. Bucci independence in her practice was commonplace for MDA. For example, a thoracic patient in October, 2017 had a treatment plan that Dr. Bucci believed was suboptimal (her faculty background at MDACC is thoracic). Nevertheless, the plan met the pre-programmed dosimetry guidelines so Dr. Bucci had no power to change the plan. The plan was also approved in chart rounds. Dr. Bucci thought the plan could be improved, but was not able to change it based on her inability to use her own independent judgment. This previously functional patient ultimately developed a Grade 3 clinical pneumonitis which may have been avoidable had Dr. Bucci been allowed to use her own independent judgment or had Dr. Chonowski or Dr. Gopal trusted her qualifications and expertise.

30. In yet another difference of treatment Dr. Bucci was told during the last site visit that the nurses were to be told her clinical treatment plans, and to that end, that her notes had to be completed within 24 hours (not closed, but completed). This was different that what was required of Dr. Gopal, Dr. Chonowski and Dr. Garg.

31. Finally, it is important to note that MDA's clinical care was lacking and that Dr. Bucci asked several times for patient surveys because of consistent negative feedback she had personally received about other doctors. Dr. Bucci had several patients she was treating

that had in fact refused radiation after seeing one of her colleagues at MDA. Her requests were denied and patient care continues to suffer at MDA to this day. Male physicians were not treated similarly. In fact their requests were respected and often implemented where Dr. Bucci's requests were ignored or dismissed.

## VI.
## SEX (GENDER) DISCRIMINATION
## UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

32. Plaintiff incorporates by reference the allegations contained in above paragraphs, as if fully rewritten herein.

33. Defendant intentionally engaged in unlawful employment practices against Plaintiff on the basis of her SEX (gender) in violation of 42 U.S.C. § 200e-2(a).

34. Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions and privileges of employment or limited, segregated or classified Plaintiff in a manner that would deprive or tend to deprive her of an employment opportunity or adversely affect her status because of Plaintiff's SEX (gender) in violation of 42 U.S.C. § 200e-2(a).

35. Defendant discriminated against Plaintiff in the form of differential treatment with regard to negative treatment discussed above including being screamed at, disrespected, undermined, gossiped about and wholly demoralized in her treatment by MDA, in violation of 42 U.S.C. § 200e-2(a).

## VII.
## EQUAL PAY ACT OF 1963, 29 U.S.C. § 206(d)

36. Plaintiff incorporates by reference the allegations contained in above paragraphs, as if fully rewritten herein.

37. Defendant is subject to the Equal Pay Act, an amendment to the Fair Labor Standards Act of 1938.

38. Plaintiff performed work in a position requiring equal skill, effort and responsibility under similar working conditions.

39. Plaintiff was paid less than members of the opposite sex.

40. Defendant discriminated against Plaintiff in the form of differential treatment with regard to compensation when she performed of equal skill, effort and responsibility under similar working conditions compared to the opposite sex (male), in violation of 29 U.S.C. § 206(d).

## VIII.
## RETALIATION
## UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

41. Plaintiff incorporates by reference the allegations contained in above paragraphs, as if fully rewritten herein.

42. Defendant has retaliated against Plaintiff by taking an adverse employment action against her after she opposed the illegal discriminatory practices (described above) subjected on Plaintiff in violation of 42 U.S.C. § 704(a).

## IX.
## RETALIATION
### UNDER 29 U.S.C. §§§ 206(d), 215(a)(3), 216(d)

43. Plaintiff incorporates by reference the allegations contained in above paragraphs, as if fully rewritten herein.

44. Defendant has retaliated against Plaintiff by taking adverse employment action against her after she opposed the illegal discriminatory practices (differential pay based on sex) used against Plaintiff in violation of 29 U.S.C. § § § 206(d), 215(a)(3), 216(d).

## X.
## DAMAGES

45. Plaintiff sustained the following damages as a result of the actions and/or omissions of Defendant described hereinabove:

   a) Compensatory damages (including emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-economic damages) allowed under Title VII and Equal Pay Act.

   b) Economic damages in the form of lost back pay and lost fringe benefits in the past. Economic damages, in the form of lost wages and fringe benefits that will, in reasonable probability, be sustained in the future, allowed under Title VII and Equal Pay Act.

   c) All reasonable and necessary costs in pursuit of this suit, including attorney's fees pursuant to Title VII and Equal Pay Act.

   d) Punitive damages for the intentional sex discrimination, retaliation and reckless indifference to the federally protected rights of Kara Bucci.

## XI.
## JURY DEMAND

46. Plaintiff demands a jury trial and tenders the appropriate fee with this complaint.

## XII.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, KARA BUCCI, respectfully prays that Defendant, M.D. ANDERSON PHYSICIANS NETWORK., be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendant for damages in an amount within the jurisdictional limits of the Court, together with interest as allowed by law, costs of court, and such other and further relief to which the Plaintiff may be justly entitled at law or in equity.

Respectfully Submitted,

kennard
miller
hernandez P.C.

_____
Alfonso Kennard, Jr.
Texas Bar No. 24036888
Federal ID No. 713316
Attorney-In-Charge
Email: Alfonso.Kennard@kennardlaw.com
2603 Augusta Drive, Ste. 1450
Houston, Texas 77057
M: 713.742.0900
F: 713.742.0951
**ATTORNEY FOR PLAINTIFF
KARA BUCCI**

**OF COUNSEL**
**FOR PLAINTIFF**
Daniel J. Salas
Texas Bar No. 24102445
Email: Daniel.Salas@kennardlaw.com
100 N.E. Loop 410, Suite 610
San Antonio, Texas 78216
Main: 210.314.5688
Fax: 210.314.5687